*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, GROSS, and de GROOT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Chanel G. SIMS**
Lieutenant Commander (O-4), U.S. Navy
*Appellant*

**No. 202200057**

_____

Decided: 31 July 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Benjamin C. Robertson (Trial)
Mishonda M. Mosely (*DuBay* Hearing)

Sentence adjudged 8 October 2020 by a special court-martial tried at Commander, Fleet Activities Yokosuka, Japan, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: no punishment.

For Appellant:
*Major Joshua P. Keefe, USMC*
*Lieutenant Christopher B. Dempsey, JAGC, USN*

For Appellee:
*Colonel Scott A. Wilson, USMC*

Senior Judge GROSS delivered the opinion of the Court, in which Chief Judge DALY and Judge de GROOT joined.

———————————

**This opinion does not serve as binding precedent under NMCCA Rule of Appellate Procedure 30.2(a).**

———————————

GROSS, Senior Judge:

This case asks us to determine whether Appellant received ineffective assistance of counsel based upon an undisclosed conflict of interest by her trial defense counsel. The claimed conflict arose because trial defense counsel did not advise Appellant that she could present as a defense that she had relied on his advice in taking the actions for which she was charged and ultimately convicted at court-martial. We find that Appellant's trial defense counsel was ineffective in his representation and take action in our decretal paragraph by setting aside the findings and sentence.

A military judge sitting as a special court-martial convicted Appellant, contrary to her pleas, of one specification of failure to obey a lawful order and one specification of prevention of authorized seizure of property in violation of Articles 92 and 131e of the Uniform Code of Military Justice (UCMJ).[1] The military judge sentenced Appellant to no punishment. A judge advocate reviewed Appellant's case under Article 65(d), UCMJ, and she timely sought review from the Judge Advocate General under Article 69(a). On 14 June 2023, the Judge Advocate General's designee denied Appellant's application for relief. On 10 August 2023, Appellant applied to this court under Article 69(d)(2). After careful review of Appellant's application, on 27 September 2023, we docketed Appellant's case and specified two issues for the parties to brief: whether the Court had jurisdiction to consider Appellant's application, and if so, what is the scope of that appellate review. After receiving briefs from the parties, the Court assumed, without deciding, that it had jurisdiction and on 31 January 2024, the Court directed the Government to secure defense counsel declarations from the detailed defense counsel and from the Commanding Officer (CO), Defense Service Office Pacific (DSO PAC). We subsequently determined

———————————

[1] Articles 92 & 131e, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 931e.

that we have jurisdiction over Appellant's appeal.[2] After receiving the defense counsel declarations, on 8 March 2024, we remanded the case for a fact-finding hearing pursuant to Rule for Courts-Martial (R.C.M.) 810(f) for the military judge to address Appellant's claims of ineffective assistance of counsel.[3]

# I. BACKGROUND

## 1. Appellant's involvement in the trial of Chief Bravo

In January 2020, Appellant served as the manning and administration officer for Naval Surface Group Western Pacific. One of the Sailors in her department, Navy Counselor Chief Petty Officer (NCC) Bravo,[4] was detained coming onto Commander, Fleet Activities Yokosuka (CFAY), Japan, on suspicion of driving under the influence of alcohol and was subsequently charged with violating a lawful order and false official statement. NCC Bravo was charged at a special court-martial and his detailed defense counsel requested that the government produce Appellant as a witness at trial.

Lieutenant (LT) Monday, the trial counsel prosecuting NCC Bravo, interviewed Appellant prior to responding to NCC Bravo's witness request. During that interview, LT Monday learned that Appellant had a text conversation with NCC Bravo on the morning that NCC Bravo had been detained for suspicion of driving under the influence of alcohol. LT Monday requested that Appellant provide him with screenshots of that text conversation; however, Appellant felt uncomfortable doing so and declined. LT Monday then issued a subpoena to Appellant seeking screenshots of the text conversation.

At first, Appellant ignored the subpoena. However, she eventually sought advice from Captain (CAPT) Hotel, CO, DSO PAC. In her meeting with CAPT

---

[2] *See United States v. Parino-Ramcharan*, 84 M.J. 445 (C.A.A.F. 2024).

[3] The parties disagree over the scope of our review under Article 69. As an initial matter, we note that in reviewing cases under Article 69, as it existed at the time of Appellant's appeal, we are limited to taking action "only with respect to matters of law." Article 69(e). We therefore summarily reject Appellant's Assignment of Error alleging that her conviction for violation of Article 131e, UCMJ, was factually insufficient. Article 69(d)(1) states that we "may review the action taken by the Judge Advocate General." While this could be read to address only errors in the Article 69 review process, we note that the issue germane to this appeal – ineffective assistance of counsel – persisted from the trial phase and through that appeal, and therefore reach the merits of the issue as presented both at trial and on appeal.

[4] All names contained within the opinion with the exception of military judges and Appellate counsel are pseudonyms.

Hotel, Appellant discussed the subpoena. Captain Hotel generally described the subpoena as being "worthless."[5] CAPT Hotel advised Appellant that she could ignore the subpoena, comply with the subpoena, or he could detail counsel to represent Appellant in order to seek to resolve the issue with the government.[6] CAPT Hotel also advised Appellant that the appropriate way for trial counsel to get the text messages at issue would have been to issue a warrant to the cell phone provider under R.C.M. 703A or through a Command Authorized Search and Seizure (CASS) directed at NCC Bravo's phone.[7]

After Appellant did not respond to the subpoena, trial counsel in NCC Bravo's case moved the military judge to issue a warrant of attachment. Appellant then returned to DSO PAC and requested to have counsel assigned to represent her. In discussing the benefits of having counsel assigned, CAPT Hotel told Appellant that rules of professional responsibility prohibited a prosecutor from speaking directly to a represented person.[8] CAPT Hotel then assigned LT Lima[9] to represent Appellant on the motion for a warrant of attachment.

Upon being detailed to represent Appellant, LT Lima sent an email to trial counsel and copied the military judge in NCC Bravo's case, Appellant, and Appellant's commanding officer informing them of his representation. In the email, LT Lima stated, "[a]ll government agents are notified that any and all communications with [Appellant], to include service of process, should be by and through me as assigned counsel."[10] LT Lima also filed a motion on Appellant's behalf seeking to have the military judge "quash the subpoena and deny the Warrant for [sic] attachment . . . . issue a cease and desist order against the government with regard to obtaining her electronically stored data through

---

[5] *DuBay* Judge findings of fact. App. Ex. XXXVII at 4; R. at 703.

[6] R. at 703, *DuBay* R. at 15-16.

[7] App. Ex. XXXVII at 5. Captain Hotel did ask Appellant if she believed she was a suspect, and testified that if she had said "yes" that he would have advised her that she should expect to receive a CASS, but because she said she did not think she was a suspect, he did not discuss the possibility of a CASS for Appellant's phones with her.

[8] App. Ex. XXXVII at 6.

[9] By the time of the *DuBay* hearing, LT Lima had promoted to Lieutenant Commander. However, for clarity we will refer to him throughout this opinion as LT Lima.

[10] App. Ex. XXV.

any other extra-judicial means."[11] The military judge granted the motion on 31 January 2020.[12]

After the military judge's ruling, Appellant and LT Lima left the courtroom and had a brief conversation. While Appellant and LT Lima disagree as to the nature of that conversation, the *DuBay* judge found that "Appellant asked [LT Lima] if she could delete the sought-after text messages along with some videos and pictures to make room on her phone . . . and [LT Lima] told her 'yeah, [that] shouldn't be a problem.'"[13] Relying on this advice, Appellant did so.[14]

After the military judge granted the motion to quash, trial counsel reached out to CAPT Hampton, Appellant's commanding officer, seeking a CASS for Appellant's personal and work phones. Captain Hampton signed the CASS, and several Masters-at-Arms (MAs) who were members of the Criminal Investigations Division (CID) for CFAY were assigned to execute the CASS.

When the MAs told Appellant that they had a CASS for her work and personal cell phones, she immediately told them to contact her attorney, LT Lima. LT Lima then spoke with the MAs over speakerphone and told them that "if they took [Appellant's] phones or anything, that they would be breaking the law and would be apprehended because it was illegal what they were doing."[15] Appellant overheard LT Lima tell the MAs this.[16] When the MA's supervisor, MACS Kilo, arrived, he directed Appellant to provide her biometrics in order to unlock her phone. Appellant told MACS Kilo that he should not speak to her disrespectfully. When she refused to heed MACS Kilo's directives again, he directed an armed MA to apprehend her and had her transported to the base security building.

---

[11] App. Ex. XXVI at 5. Appellant's motion cited no authority for the request for a cease and desist order.

[12] App. Ex. XXVIII.

[13] Ap. Ex. XXXVII at 6. This finding of fact, like the remainder of the *DuBay* judge's findings set forth in this opinion, is not clearly erroneous. Although LT Lima vigorously denied telling Appellant that she could delete the text messages in his affidavit, his testimony softened at the *DuBay* hearing, where he admitted that he had told Appellant that the Government would not seek the messages through a subpoena. The military judge credited Appellant's version of the interaction.

[14] Appellant's Mot. to Attach, App'x B at 3.

[15] App. Ex. XXXVII at 7.

[16] *Id.*

LT Lima arrived sometime later at the security building. After reviewing the CASS, LT Lima advised Appellant to provide her biometrics and passcodes, and she was released. With the phones now unlocked, government investigators searched the phones for the text messages but did not recover them since the text messages had been deleted. Appellant was subsequently charged with several charges and specifications of failure to obey a lawful order, and one specification of prevention of authorized seizure of property in violation of Articles 92 and 131e of the UCMJ. The Article 92 Specification alleged that Appellant refused to provide her fingerprints and facial features to unlock her phones as required by the CASS. The Article 131e Specification alleged that Appellant deleted text messages with NCC Bravo which Appellant knew persons authorized to make searches and seizures were endeavoring to seize.

### 2. Appellant's Court-Martial

LT Lima was detailed to represent Appellant at her trial, which was presided over by a different military judge. CAPT Hotel testified at the *DuBay* hearing that prior to detailing LT Lima to the case, he directed LT Lima to contact his state licensing authority to determine whether there was a conflict of interest in his representation.

According to LT Lima, he contacted his state licensing authority to obtain an ethics opinion as to whether his participation with Appellant during the service of the CASS would be a conflict. An attorney with the state ethics hotline advised him to "go look it up" but also opined that "these facts . . . in [the state bar official's] opinion . . . did not invoke [rule] 3.7 [of the state ethics rules]."[17] LT Lima did not make a contemporaneous memorandum of this discussion and there is no record of what actual facts were relayed to the ethics hotline employee or the exact substance of the advice rendered.[18]

LT Lima and CAPT Hotel also discussed internally whether there was a conflict, however, LT Lima never told CAPT Hotel that Appellant had sought his advice on whether she could delete the text messages.[19] Appellant also never contacted any other ethics advisors listed in JAGINST 5800.3E, the Navy Judge Advocate General's rules of professional responsibility.

---

[17] *Id.* at 10.

[18] *Id.*

[19] *Dubay* R. at 194.

Prior to trial, CAPT Hotel also assigned his executive officer as counsel.[20] CAPT Hotel testified that he directed CDR Papa to have a discussion with Appellant regarding possible conflicts of interest, and CDR Papa reported back that he had done so. However, CDR Papa has no recollection of this conversation with Appellant. Whatever may have been discussed during that conversation, CDR Papa never discussed with Appellant that LT Lima could testify at trial in her defense.[21]

During motion sessions and at trial, LT Lima's involvement in Appellant's case from a factual standpoint became apparent almost immediately. As part of a motion to suppress, Appellant testified at an Article 39(a), UCMJ, session regarding the circumstances of the search and seizure. During her testimony, Appellant discussed the execution of the CASS, including details of what LT Lima did and said to her and to the MAs executing the CASS. At one point, the military judge interrupted LT Lima's examination, saying that LT Lima was "trying to do a delicate dance, and I appreciate it . . . . However, an attorney cannot be a witness."[22] Although the military judge noticed that LT Lima was inextricably intertwined with the facts of Appellant's case, he never inquired as to whether Appellant had had the benefit of conflict-free counsel to determine whether a conflict of interest existed and whether it had been waived. LT Lima then continued to conduct Appellant's direct examination. Throughout the motions hearing and during trial on the merits, multiple witnesses testified to their interactions with LT Lima prior to, during, and after the execution of the CASS.

Also during the suppression motion hearing, Appellant testified that after the military judge in NCC Bravo's case quashed the subpoena for the text messages, she believed that this issue was over and that the Government would not seek her phone. In his declaration to this Court, LT Lima stated that he advised Appellant that she should not testify at trial because she would have to admit that she had deleted the text messages.[23]

After trial on the merits, the military judge found Appellant guilty of violating Articles 92 and 131e. He adjudged a sentence of no punishment. LT

---

[20] Since the events of Appellant's trial, CDR Papa has been promoted to Captain.

[21] App. Ex. XXXVII at 11.

[22] R. at 41.

[23] App. Ex. XXXIII at 8. While LT Lima claims in his affidavit that he explicitly advised Appellant not to delete the messages, the *DuBay* judge did not credit this claim in her findings of fact. *See supra* n.13.

Lima and CDR Papa continued to represent Appellant post-trial. CDR Papa submitted claims of legal error to the convening authority under Article 38(c), UCMJ, but did not raise any issue regarding LT Lima's representation of Appellant. The convening authority noted but did not comment on the issues raised.[24] LT Lima then filed a 28-page single-spaced appeal with the Judge Advocate General under Article 69. Again, the appeal never commented on nor raised any issue with regard to LT Lima's personal involvement in the case.

The Judge Advocate General denied Appellant's Article 69 appeal on 14 June 2023. On 10 August 2023, Appellant sought review with this Court. Represented (and apparently advised) for the first time by someone outside of DSO PAC, Appellant immediately claimed that she received ineffective assistance of counsel from LT Lima. In particular, Appellant claimed her counsel had a personal conflict of interest when he failed to recuse himself after making himself a material witness in her case.[25]

## II. DISCUSSION

### A. Appellant received ineffective assistance of counsel when LT Lima labored under a conflict of interest.

#### 1. Law

Counsel are presumed to be competent. As a general matter, an appellate court will not second-guess strategic or tactical decisions made at trial by defense counsel.[26] Where an appellant challenges such decisions, she must identify specific defects in performance that were objectively unreasonable under prevailing professional norms.[27] However, the matter before the Court is not

---

[24] The judge advocate who performed the initial review of Appellant's case under Article 65, UCMJ, a Navy Captain, incorrectly stated that "Each allegation of error raised by the accused was addressed by the Convening Authority." App. Ex. XXIII at 2.

[25] Since the personal conflict of interest was unexplained in the record of the trial, this Court remanded the case for further fact-finding pursuant to Courts-Martial 810(f) concerning Appellant's claims of ineffective assistance of counsel by her trial defense counsel.

[26] *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)).

[27] *Id.* (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006) (citations and quotation marks omitted).

assessing defense counsel's tactical trial decision, i.e., not availing himself as a material witness, but rather whether he made that tactical decision because he labored under a conflict of interest.

An allegation of ineffective assistance of counsel presents a mixed question of law and fact which we review *de novo*.[28] The Court of Appeals for the Armed Forces (CAAF) has called for a "case-by-case" determination of whether a potentially conflicted counsel's representation should be reviewed for specific prejudice under *Strickland v. Washington* [29] or whether a conflict is so inimical to effective representation as to be inherently prejudicial to be reviewed under *Cuyler v. Sullivan*.[30] While certain types of conflicts, e.g., concurrent representation of co-defendants, have been deemed inherently prejudicial, courts have declined to extend this presumption to all conflicts.[31]

A potential conflict exists if the interests of an accused may place the defense counsel under inconsistent duties at some time in the future.[32] In *Saintaude*, the defense counsel's "potential conflicts" consisted primarily of unsubstantiated accusations against counsel and allegations that one civilian counsel's friendship with a prior civilian defense counsel made him reluctant to press the prior counsel for essential case files.[33] These were purely speculative allegations of conflict and warranted no presumption of prejudice. Therefore, the Court applied the *Strickland* test to determine whether the potential conflicted representation created specific prejudice. An actual conflict of interest is presumed prejudicial under *Cuyler*.

We have previously held that where an appellant demonstrates that his counsel labored under an actual conflict of interest, and where the conflict had

---

[28] *United States v. Smith*, 44 M.J. 459, 460 (1996).

[29] *Strickland v. Washington,* 466 U.S. 668 (1984).

[30] *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

[31] *See Cuyler*, 446 U.S. at 348-49 ("not all attorney conflicts present comparable difficulties, and . . . most cases will require specifically tailored analyses in which the appellant must demonstrate both the deficiency and prejudice under the standards set by *Strickland*."); *Compare United States v. Cain*, 59 M.J. 285 (C.A.A.F. 2004) (soliciting and committing homosexual acts with a military subordinate who is charged with committing homosexual acts in violation of the UCMJ as it then existed).

[32] *United States v. Hale*, 76 M.J. 713, 722 (N-M Ct. Crim. App. 2017) (quoting *Ventry v. United States*, 539 F.3d 102, 111 (2nd Cir. 2008)).

[33] *United States v. Saintaude*, 61 M.J. 175, 180 (C.A.A.F. 2005).

an adverse effect on the counsel's performance, the appellant is entitled to a presumption of prejudice under *Cuyler*.[34] In *Cuyler,* the Supreme Court held:

> [P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties . . . . Prejudice is presumed only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.[35]

Therefore, a conflict is a necessary, but alone an insufficient prerequisite, to benefit from *Cuyler*'s limited presumption.[36] A conflict of interest is actual, as opposed to potential, when, during the course of the representation, "the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action."[37]

When applying *Cuyler*, an appellant must also show that the conflict of interest adversely affected counsel's performance.[38] This means that an "actual lapse in representation" resulted from the conflict. An adverse effect "cannot be presumed from the mere existence of a conflict of interest."[39] To prove a lapse in representation, an appellant must show "that some plausible alternative defense strategy or tactic might have been pursued," but was not.[40] Furthermore "the alternative defense [must be] inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."[41]

Simple disagreements about tactics and unsubstantiated accusations of unethical conduct, such as those the CAAF faced in *Saintaude*, are appropriately addressed under the *Strickland* standard. But by requiring an actual conflict

---

[34] *Hale*, 76 M.J. at 722.

[35] *Id.* at 718 (quoting *Strickland,* 446 U.S. at 692).

[36] *Id.* at 731 (citing *Perez*, 325 F.3d at 125 (citation and internal quotation marks omitted)).

[37] *Id.* at 722; *See also United States v. Mickens*, 535 U.S. 162, 173-75. (2002) (The Court noted that *active presentation of conflicting interests* that had necessitated a presumption of prejudice in *Cuyler*).

[38] *Mickens*, 535 U.S. at 171.

[39] *Hale*, 76 M.J. at 722 (quoting *Rubin v. Gee*, 292 F.3d 396, 401(4th Cir. 2002)).

[40] *Id.* (quoting *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993)).

[41] *Id.* at 722-23 (quoting *Winkler*, 7 F.3d at 309).

that adversely affected counsel's representation, we can be certain that we are reserving *Cuyler*'s limited presumption for only those cases in which the duty of loyalty has actually been breached. It is this breach of the fundamental duty of loyalty—and its deleterious, hard-to-quantify effect on the reliability of the proceeding—that is the rationale for the presumption in the first place.

In addition, judges have a sua sponte duty to resolve conflict questions on the record when the trial court knows, or reasonably should know, that a particular conflict exists.[42] However, a personal interest, even if unexplained in the record of trial, does not, *per se*, mandate reversal.

*2. Discussion*

Appellant received bad legal advice that she could safely delete her text messages without repercussion, which she followed to her detriment. When Appellant was charged with acts she undertook after the advice of her attorney, that same attorney represented her first at trial and then on appeal without informing Appellant that she could raise her reliance on his advice in her defense. Under the facts in the record and as found by the *DuBay* judge, we have no trouble in concluding that LT Lima labored under an actual conflict of interest, and that Appellant has shown "that some plausible alternative defense strategy or tactic might have been pursued."[43] We also conclude that pursuing this alternative defense theory "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."[44]

The Government argues that the facts of this case only demonstrate that there was a possibility of a conflict. We disagree. As a primary matter, the Government's premise rests heavily on its disagreement with the *DuBay* judge's finding of fact that LT Lima told Appellant that it "shouldn't be a problem" if she deleted the text messages in issue. As we noted above, this finding of fact was not clearly erroneous, and as such we adopt it as true.

Once we accept as true this finding of the *DuBay* judge, the Government's remaining arguments simply fall apart. In this case, we find the detailed defense counsel and supervisory counsel erred in judgment in determining that a personal conflict of interest was not present. One clearly was.

---

[42] *United States v. Murphy*, 50 M.J. 4, 10 (C.A.A.F. 1998) (citing *United States v. Breese*, 11 M.J. 17, 20 (CMA 1981)).

[43] *Hale*, 76 M.J. at 722 (quoting *Winkler*, 7 F.3d at 309).

[44] *Id.* at 722-23

While the Government argues that there was no prejudice because CAPT Hotel still testified as to his advice to Appellant, this fails to account for the fact that CAPT Hotel had no idea that LT Lima had told Appellant that she could delete the text messages. While the Government is correct that the tactical decisions of a defense counsel should not be subject to "Monday morning quarterbacking," that deference to counsel falls apart when, under *Cuyler,* an Appellant is entitled to a presumption of prejudice based upon an undisclosed conflict.

LT Lima, both in his testimony and his affidavit, states that he made a tactical decision not to admit that Appellant had deleted the text messages because to do so would "incriminate her."[45] Viewed in a vacuum, this assertion makes sense. However, here the circumstances of the deletion are critical to this case.

As an initial matter, Appellant's argument at trial as to why the Government had failed to find the requested messages was weak and focused on attempting to identify flaws in the digital forensic extraction done by government agents. LT Lima's theme in his closing argument was a failure by members of the government to communicate with Appellant, but he failed to recognize that the biggest failure in communication occurred between him and his client when he wrongly advised her that she could delete the text messages and then failed to tell her that she could raise that advice in her defense.

At the *DuBay* hearing, CAPT Hotel testified that had LT Lima told him that he had advised Appellant that she could delete the messages, his decision on detailing LT Lima to represent Appellant at trial would have hinged on whether that advice was "good."[46] This statement fails to recognize the crux of Appellant's argument on appeal and is instructive as to how DSO PAC failed to perceive the conflict of interest at issue. The question should never have been whether the advice was good or bad, but rather whether Appellant relied on it in taking the actions that later resulted in her being prosecuted. Whether LT Lima's advice was good or bad, he should have advised Appellant that she could put that advice before the trier of fact as a defense to the charged misconduct. If Appellant did not believe that authorities were still endeavoring to seize the text messages on her phone because of LT Lima's advice, that fact would have negated one of the elements of the Article 131e Specification.

---

[45] App. Ex. XXXIII at 7-8; *DuBay* R. at 238.

[46] *Dubay* R. at 194.

*Cuyler* does not require evidence to establish that such alternative defense theories and tactics must have been pursued, but rather that there was an opportunity for such theories and tactics to be pursued. Had LT Lima put that information before the court-martial, two defense theories could have been pursued. First, LT Lima could have admitted that his assessment of the situation with Appellant was incorrect and that the Government was, in fact, still seeking the text messages. Second, he could have provided an explanation for Appellant's actions in deleting the messages that – if believed – would have presented a complete defense to the Article 131e charge negating any specific intent requirement within the elements of the offense.

It is clear there is some plausible alternative defense theory or tactics that could have been pursued during the Appellant's trial. By failing to present such defenses and tactics, LT Lima failed his client. Failing to pursue an obvious defense that, if believed, would have been a complete defense to the 131e Charge, under these circumstances, leads us to conclude that LT Lima placed his own interests and loyalties - to himself - above that of his client's.

So to with respect to the orders violation, LT Lima recognized that he was a critical witness regarding Appellant's interactions with the MAs from CID. The nature and timing of Appellant's response to CAPT Hampton's order that she provide her biometrics to unlock her phones was the crux of this specification. However, he testified at the *DuBay* hearing that he made the decision not to testify as lead counsel and that as lead counsel that decision was his call. Neither LT Lima nor any member of DSO PAC ever advised Appellant that LT Lima might have a professional interest in not testifying and subjecting his actions or legal advice to scrutiny under examination. The military judge also seemed to recognize this possibility when Appellant took the stand to testify at the motions hearing. Rather than stepping in to ensure that Appellant had been properly advised and received conflict-free counsel, the military judge missed the opportunity and improperly aimed his focus to simply admonish LT Lima against acting as a witness in Appellant's case.

## III. CONCLUSION

The findings and sentence are set aside. We decline to order a rehearing. "The text of Article 66(d), UCMJ, does not obligate a CCA to authorize a rehearing. The statute says that a CCA *may* order a rehearing; it does not say that it must."[47] While we grant relief based on our finding that LT Lima was

---

[47] *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016).

ineffective, we note several factors that weigh against a rehearing. First, the post-trial processing of Appellant's case was lacking in that the officer reviewing Appellant's convictions did not even list, much less respond to, Appellant's claims of error alleged pursuant to Article 38(c). Additionally, Appellant's review under Article 69 apparently failed to recognize or address the rather obvious concerns with Appellant being represented both at trial and before the Judge Advocate General by an attorney with substantial first-hand knowledge of at least some of the alleged misconduct.

All of this is against the backdrop of a case that was tried nearly five years ago, and for which no punishment was imposed. The interests of justice do not warrant a retrial under these circumstances. The charges and specifications are **DISMISSED WITH PREJUDICE.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court